*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0432p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

SHELLEY EVANS-MARSHALL,

          *Plaintiff-Appellee,*

    *v.*

BOARD OF EDUCATION OF THE TIPP CITY EXEMPTED
VILLAGE SCHOOL DISTRICT; CHARLES W. WRAY,
individually; and JOHN T. ZIGLER, individually,

          *Defendants-Appellants.*

No. 04-3524

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 03-00091—Walter H. Rice, District Judge.

Argued:  April 25, 2005

Decided and Filed:  November 1, 2005

Before:  COLE and SUTTON, Circuit Judges; ZATKOFF, District Judge.[*]

———————

## COUNSEL

**ARGUED:**  Tabitha D. Justice, SUBASHI, WILDERMUTH  &  BALLATO, Dayton, Ohio, for
Appellants.  Joanne Jocha Ervin, Dayton, Ohio, for Appellee.  **ON BRIEF:**  Tabitha D. Justice,
Lynnette P. Ballato, SUBASHI, WILDERMUTH  &  BALLATO, Dayton, Ohio, for Appellants.
Joanne Jocha Ervin, Dayton, Ohio, for Appellee.

    COLE, J., delivered the opinion of the court.  SUTTON, J. (pp. 9-12), delivered a separate
concurring opinion.  ZATKOFF, D. J. (pp. 13-14), delivered a separate opinion concurring in part
and dissenting in part.

———————

## OPINION

———————

    R. GUY COLE, JR., Circuit Judge.  This is a civil rights case brought under 42 U.S.C.
§ 1983.  Plaintiff-Appellee Shelley Evans-Marshall, a public high school teacher, filed a complaint
against Defendants-Appellants, the Board of Education of Tipp City Exempted Village School

---

[*]The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting
by designation.

District; John T. Zigler, the Superintendent of the Tipp City Schools; and Charles W. Wray, the principal of Tippecanoe High School, a high school in the Tipp City school district. Evans-Marshall argues that Zigler and Wray, in recommending the non-renewal of her teaching contract, retaliated against her for exercising her rights under the First Amendment. The Defendants-Appellants filed a motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Upon denial of the motion, the Defendants-Appellants have lodged this interlocutory appeal. For the following reasons, this Court **AFFIRMS** the judgment of the district court.

## I.  Factual Allegations and Background

According to the allegations of the Complaint, Shelley Evans-Marshall is a certified high school teacher and a former employee of the Board of Education of Tipp City Exempted Village School District (the "Board"), located near Dayton, Ohio. Evans-Marshall was hired by the Board to teach language arts to high school students at Tippecanoe High School, and to advise the high school literary magazine for the 2000-2001 school year. During her employment, Evans-Marshall's direct supervisor was the principal of Tippecanoe High School, Charles W. Wray.

Throughout the 2000-2001 school year, Evans-Marshall received periodic evaluations from Wray. On January 4, 2001, her evaluation had six ratings of outstanding, fifteen ratings of satisfactory, and no unsatisfactory ratings. On April 10, 2001, she received five ratings of outstanding, sixteen ratings of satisfactory, and no unsatisfactory ratings. At the end of the school year, Evans-Marshall's teaching and literary magazine contracts were renewed.

On October 22, 2001, approximately twenty-five parents attended a public meeting of the Board of Education of the Tipp City Schools to "express concerns about the appropriateness and merit of some materials that had been assigned to the students as optional reading." The next day, Wray told Evans-Marshall, in front of the school's English teachers, that she was on the "hot-seat" because parents complained at the Board meeting about Evans-Marshall's assignment of the book *Siddhartha* to her students. Shortly thereafter, Evans-Marshall was evaluated for the first time for the 2001-2002 school year, and received no negative comments.

At the next Board meeting, held on November 26, 2001, public criticism of Evans-Marshall intensified. According to the Complaint, "approximately 100 parents were in attendance to protest the presence of material in classes and school libraries that the parents thought obscene." A petition was also presented with about 500 signatures that called for "decency in education." According to Evans-Marshall, the focus of the parents' concern was the subject matter presented in her classes.

Several weeks after the November 26 meeting, Wray formally observed Evans-Marshall in her classroom. Following the observation, Wray, for the first time, gave Evans-Marshall negative comments concerning her performance. He also provided her with instructions: "Any material containing graphic violence, sexual themes, profanity, suicide, drugs and alcohol need [sic] to be discussed with your department chairs before being used in class." Evans-Marshall responded to the instruction in writing. She noted that the materials used in her class were the novels *Fahrenheit 451*, *To Kill a Mockingbird*, and *Siddhartha*, that none of these books had any inappropriate themes, and that each book "had been purchased and approved by the Board."

Evans-Marshall's first written evaluation following the November 26 meeting was notably more critical than previous evaluations. On January 10, 2002, Wray rated Evans-Marshall as "unsatisfactory on 4 criteria, outstanding on only 2 criteria, and satisfactory on 15 performance criteria." Wray further commented that "Use of material that is pushing the limits of community standards through graphic violence and sexual overtones has created a negative image in the community . . . . Continued to use or tried to use material that was questionable after being told to get such material reviewed by department chairpersons or the principal."

On March 11, 2002, Evans-Marshall showed her class *Romeo + Juliet*, a movie adaptation of the Shakespeare play. Wray observed the class again and asked Evans-Marshall about the rating of the movie. Evans-Marshall informed him that it was rated PG-13. According to the Complaint, prior approval is not required to show movies rated PG-13.

On March 21, 2002, Evans-Marshall received her second written evaluation since the November 26 meeting; it was also very critical. Evans-Marshall "received 5 ratings of unsatisfactory, one rating of outstanding, and 15 ratings of satisfactory." Wray made the following comment in writing: "The evaluation from the first part of the year addressed several areas of concern that has [sic] arisen this year. There have been improvements but not enough to recommend a continuing contract."

Superintendent Zigler recommended the non-renewal of Evans-Marshall's contract at the Board's meeting on March 25, 2003. In accordance with Zigler's recommendation, the Board unanimously passed a motion not to renew Evans-Marshall's contract, and hired a replacement teacher. Evans-Marshall made various attempts to challenge the dismissal, all of which were denied by the Board.

Evans-Marshall brought suit in federal court under 42 U.S.C. § 1983, seeking injunctive relief and damages. She alleges that she was terminated in "retaliation for the curricular and pedagogical choices she made while teaching at Tippecanoe High School and the exercise of rights under the First Amendment." Evans-Marshall seeks recovery against the Board, as well as Wray and Zigler.

The Defendants-Appellants moved to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court denied the motion; this timely appeal ensued.

## II. Analysis of Retaliation Claim

### A.     Standard of Review and Elements of Retaliation

On a Rule 12(b)(6) motion, we construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the pleader. *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002); *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 677 (6th Cir. 2001); *see also* WRIGHT & MILLER, 5B FEDERAL PRACTICE AND PROCEDURE § 1357 at 417 (3d ed. 2004). Claims under 42 U.S.C. § 1983 "are not subject to heightened pleading standards." *Memphis, Tenn., Area Local, Am. Postal Workers Union, AFL/CIO v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004). Therefore, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). "If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). Claims lacking factual merit are properly dealt with through summary judgment under Rule 56. *Id.* This is because, under the notice pleading standard of the Federal Rules, courts are reluctant to dismiss colorable claims which have not had the benefit of factual discovery. *See Conley v. Gibson*, 355 U.S. 41, 48 (1957) ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."). A motion to dismiss "should not be granted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir. 1976) (citing *Conley*, 355 U.S. at 45-46).

In this case, Evans-Marshall claims she was terminated due to activities protected under the First Amendment. Accordingly, she must allege the following elements in order to establish a constitutionally protected right for the purposes of qualified immunity:

> (1) that [she] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [her] constitutional rights.

*Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001). If these elements are satisfied, the defendants may rebut the claim by establishing, by a preponderance of the evidence, that "they would have taken the same action even in the absence of the protected conduct." *Id.* (internal quotes and citation omitted).

## B.          Whether the Activity Was Constitutionally Protected

In considering the first element of First Amendment retaliation — whether a state-employed teacher's in-class speech is constitutionally protected by the First Amendment — this Court has consistently applied the balancing test announced in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and refined in *Connick v. Myers*, 461 U.S. 138 (1983). *See Cockrel*, 270 F.3d at 1055 n.7 (citing cases); *Hardy*, 260 F.3d at 678; *Bonnell v. Lorenzo*, 241 F.3d 800, 811-12 (6th Cir. 2000); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1185 (6th Cir. 1995).

Under that familiar test, we first determine whether Evans-Marshall's activity constitutes "speech" within the meaning of the First Amendment. *See Cockrel*, 270 F.3d at 1048. If Evans-Marshall's activity was "speech," she must show: (1) that she "was disciplined for speech that was directed toward an issue of public concern"; and (2) that her "interest in speaking as [she] did outweighed the [school's] interest in regulating [her] speech." *Hardy*, 260 F.3d at 678 (citing *Pickering*, 391 U.S. at 574); *Cockrel*, 270 F.3d at 1050 (same). In determining whether speech is on a matter of public concern, we look to the "content, form, and context of a given statement, as revealed by the whole record." *Hardy*, 260 F.3d at 678 (citing *Connick*, 461 U.S. at 147-48). As to the content of the speech, "so long as the speech relates to matters of 'political, social, or other concern to the community,' as opposed to matters 'only of personal interest,' it shall be considered as touching upon matters of public concern." *Cockrel*, 270 F.3d at 1052 (citing *Connick*, 461 U.S. at 146-49).

The concurrence would reexamine our application of *Pickering* to in-class curricular speech because "[t]he Supreme Court has never held that the First Amendment applies to a teacher's classroom speech, and there is good reason to think it would not do so." Conc. ¶6. Of greater relevance is that the Supreme Court has never removed in-class speech from its presumptive place within the ambit of the First Amendment. *See Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 415-16 (1979) ("The First Amendment forbids abridgment of the 'freedom of speech.' *Neither the Amendment itself nor our decisions indicate that this freedom is lost* to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.") (emphasis added).

Moreover, the Supreme Court has characterized the proposition that "students and teachers do not shed their constitutional rights to freedom of speech and expression at the schoolhouse gate" as "the unmistakable holding of [the] Court for almost 50 years." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). *See also Pickering*, 391 U.S. at 568 ("[T]eachers may [not] constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest."); *Keyishian v. Bd. of Regents*, 385 U.S.

589, 605-06 (1967) ("[T]he theory that public employment . . . may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected."). The assumption that the Court would draw a distinction between the schoolhouse gate and the doors of the classroom is counterintuitive. *See id.* at 683 ("The classroom is peculiarly the 'marketplace of ideas.'"); *Hardy,* 260 F.3d at 671 ("In light of [Supreme Court] precedent, the argument that teachers have no First Amendment rights when teaching, or that the government can censor teacher speech without restriction, is totally unpersuasive.").

In any event, applying *Pickering* pursuant to *Cockrel*, the district court held that dismissal of the individual defendants was inappropriate:

> [T]aking the facts in Plaintiff's Complaint as true and giving her the benefit of every reasonable inference to be drawn therefrom, it is clear that her assignment of certain books to her students constitutes speech, that the Complaint does not, upon its face, sufficiently detail the subject matter of the allegedly offensive books sufficiently to allow this Court to determine whether they touch upon matters of public concern and, further, that this Court cannot undertake the balancing test required by [*Pickering*] based upon the Complaint alone. Moreover, a reasonable inference to be drawn as pled by the Plaintiff, if accepted by the trier of fact, may lead it to conclude that the decision to terminate her was based, at least in part, upon her decision to assign the books in question.

Dist. Ct. Dec. at 2. We conclude that this decision was not in error.

### 1.      *Teaching as Speech*

As an initial matter, the activity at issue is "speech" for the purposes of the First Amendment. In this case, the disputed materials — three well-respected novels and a movie adaptation of a Shakespeare play — are clearly protected by the First Amendment. *See Metzger v. Percy*, 393 F.2d 202, 204 (7th Cir. 1968) ("Motion pictures, like books, are protected by the constitutional guarantees of freedom of speech and press."). Furthermore, our precedent establishes that the assignment by a public school teacher of protected materials is itself "speech" within the meaning of the First Amendment. *See Cockrel*, 270 F.3d at 1049 (holding a teacher's sponsorship of an in-class speaker on industrial hemp was speech, despite the lack of a "particularized message" such as "advocating or speaking against hemp's use as an environmental alternative to cutting down trees"); *Stachura v. Truszkowski*, 763 F.2d 211, 214-15 (6th Cir. 1985) (holding that a teacher's in-class use of movies on sexual maturity is protected by the First Amendment), *rev'd on other grounds by Memphis Cmty. Sch. Dist v. Stachura*, 477 U.S. 299, 304-05 (1986).

Relying on *Fowler v. Board of Education*, 819 F.2d 657 (6th Cir. 1987) (single-judge opinion), the individual defendants argue that the assignment of the disputed materials is not "speech" and that the allegations of the Complaint do not establish an advocative or expressive purpose in the assignment of the various literary works. *Id.* at 662-64 (Milburn J., concurring) (holding that the in-class showing of a movie on a non-instructional day was not speech since the teacher conceded she had no curricular, communicative, or expressive intent). However, as we have recently noted, *Fowler* is a single-judge opinion and as such not binding on this Court. *See Cockrel*, 270 F.3d at 1049-50. Furthermore, the two remaining judges on the *Fowler* Court concluded that the showing of the movie *was* speech for the purposes of the First Amendment. *See id.* (citing *Fowler*, 819 F.2d at 667, 669-70).

## 2.        *A Matter of Public Concern*

Having determined that the Complaint alleges activity sufficient to be considered "speech," Evans-Marshall must now establish by allegation that the speech is constitutionally protected. To do this, Evans-Marshall must allege sufficiently that her speech "touched on a matter of public concern." *Cockrel*, 279 F.3d at 1050.

In the Complaint, Evans-Marshall contends that her termination "was retaliation for the curricular and pedagogical choices she made while teaching at Tippecanoe High School and the exercise of rights under the First Amendment." Evans-Marshall specifies that she assigned the books *Siddhartha, Fahrenheit 451*, and *To Kill a Mockingbird*, and the movie *Romeo + Juliet*, to an upper-level high school language art class. Under Rule 12(b)(6), we must resolve all reasonable inferences in favor of the plaintiff. *Rossborough Mfg. Co.*, 301 F.3d at 489. We draw the reasonable inference that Evans-Marshall taught the main themes of the work she assigned. For instance, in teaching *To Kill a Mockingbird*, it is reasonable to infer that Evans-Marshall taught the themes of race and justice in the American South. Such content is clearly a matter of public concern. *See Cockrel*, 270 F.3d at 1052; *Hardy*, 260 F.3d at 679 (noting that "race, gender, and power conflicts in our society" are "matters of overwhelming public concern"). The same can be said of the other disputed works: spirituality (*Siddhartha*), the intersection of love and politics, (*Romeo + Juliet*), and, of course, government censorship of books (*Fahrenheit 451*).

## 3.        *The Balancing Test*

Having established that Evans-Marshall's speech was of public concern, we now balance the speech against the interests of the Board. The individual defendants identify a host of factors that support "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. The individual defendants argue that Evans-Marshall was terminated for insubordination, lack of communication, and lack of teamwork, and not for her First Amendment activity. The individual defendants then note that the Board has a statutory duty to control the curricular and pedagogical choices of its teachers. *See* Ohio Rev. C. § 3313.60(A) (2005) ("The board of education of each city and exempted village school district . . . shall prescribe a curriculum for all schools under their control."). Finally, the individual defendants note that the Board may limit curricular speech with which it does not agree. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272-73 (1988) (holding that student speech in a school newspaper is subject to reasonable regulations by principal).

The individual defendants have not shown that the allegations and reasonable inferences therefrom fail to establish "any set of facts that could be proved consistent with the allegations." *Hishon*, 467 U.S. at 73. The claim that Evans-Marshall's termination was for non-retaliatory reasons cannot be considered without some factual discovery. On a motion to dismiss, we are required to assume the plaintiff's factual allegations to be true. *See Rossborough Mfg. Co.*, 301 F.3d at 489. Here, Evans-Marshall alleges that the Board's reasons for termination were merely a pretext for retaliation. This is supported by factual allegations that Evans-Marshall received negative job evaluations due to criticism from the community related to the alleged speech, and not due to her employment performance. Such allegations are sufficient to survive a motion to dismiss.

Regarding control of the curriculum and disassociation with objectionable speech, our precedent is instructive. We have previously concluded that the prior approval of controversial speech by the school or the Board undercuts the interests of the state in controlling the workplace. *See Cockrel*, 270 F.3d at 1054-55 ("[W]e cannot allow [concerns of harmony, efficiency, and discipline] to tilt the *Pickering* scale in favor of the government . . . when the disruptive consequences of the employee speech can be traced back to the government's express decision permitting the employee to engage in that speech."); *see also Stachura*, 763 F.2d at 214-15.

Evans-Marshall alleges that the three novels "had been purchased and approved by the Board." Furthermore, the movie used in class was rated PG-13, and according to Evans-Marshall, could be shown without prior approval. Nonetheless, after a public outcry related to the use of the disputed materials, Evans-Marshall alleges that she was criticized publicly by Wray, received negative evaluations for the first time, and was eventually terminated. Such allegations are sufficient to establish protected First Amendment activity under the *Pickering* test, at least for the purposes of a motion to dismiss.

## C.     The Remaining Elements of Retaliation

Evans-Marshall's allegations also satisfy the remaining elements of a First Amendment retaliation claim. Specifically, non-renewal is "an injury that would likely chill a person of ordinary firmness from continuing in [the] activity." *Cockrel*, 270 F.3d at 1048, 1055. As noted above, Evans-Marshall adequately alleges that her non-renewal "was motivated at least in part as a response to the exercise of her free speech rights." *Id.* at 1055.

As to the rebuttal of the individual defendants, our inquiry is again limited by the early stage of this case. Assuming, as we must, that the allegations of the Complaint are true, and without the benefit of factual discovery, the individual defendants cannot show that "they would have taken the same action even in the absence of the protected conduct." *Id.* at 1048. Indeed, Evans-Marshall alleges that the public outcry related to her protected First Amendment activity was the motivating factor behind her termination.

## III. Analysis of Qualified Immunity

The individual defendants also raise a qualified immunity defense as a basis for their Rule 12(b)(6) motion. We engage in a two-step process for determining whether a state actor is entitled to qualified immunity. First, whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer[s'] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* We review *de novo* the question of qualified immunity on a motion to dismiss. *Hardy*, 260 F.3d at 677.

Evans-Marshall has made allegations sufficient to satisfy the first prong of qualified immunity, that "the officer[s'] conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. at 201. Since the Complaint adequately alleges a claim of First Amendment retaliation, there are sufficient allegations to support a claim that the individual defendants violated Evans-Marshall's constitutional rights by terminating her. *See Hardy*, 260 F.3d at 682 (noting that first prong of qualified immunity is met when First Amendment retaliation is adequately alleged).

Evans-Marshall's claim also satisfies the second prong of qualified immunity, that "the right was clearly established." *Saucier*, 533 U.S. at 201. Under a liberal reading of the Complaint, Evans-Marshall was terminated due to a public outcry engendered by the assignment of protected material that had been approved by the Board. Such a claim dovetails with previous, meritorious claims in this circuit. *See Cockrel*, 270 F.3d at 1054-55; *Stachura*, 763 F.2d at 214-15.

The dissent calls our attention to the comments by several of our sister circuits to the effect that constitutional rights discovered only pursuant to a balancing of interests have special implications for qualified immunity. The First Circuit, for instance, has expressed concern that "when the law requires a balancing of competing interests, it may be unfair to charge an official with knowledge of the law in the absence of a previously decided case with clearly analogous facts." *Borucki v. Ryan*, 827 F.2d 836, 848 (1st Cir. 1987); *see also Myers v. Morris*, 810 F.2d 1437, 1462

(8th Cir. 1987) (holding that a right subject to a balancing test "can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent").

Yet *Cockrel* is clearly analogous to the facts at bar. In *Cockrel*, a teacher was fired because of a public outcry over material she presented in class that had been approved by the school. 270 F.3d at 1045. We held that her presentation of material in class constituted speech that dealt with a matter of public interest. *Id.* at 1053. We assumed that the concerns of the school did not outweigh Cockrel's interest in speaking because the school had approved the very material that gave rise to the disruption. *Id.* at 1054-55. Even were this circuit to adopt the reasoning of some of our sister circuits, surely the fact that Evans-Marshall assigned books, whereas Cockrel brought in a guest lecturer about industrial hemp, does not obscure the constitutional right at issue.

## IV. The Municipal Defendant

The Board also appeals the district court's denial of the motion to dismiss. However, an exercise of jurisdiction over a municipal defendant after the denial of a motion to dismiss is ordinarily improper. Under the collateral order doctrine, "an order rejecting the defense of qualified immunity at *either* the dismissal stage *or* the summary judgment stage is a 'final' judgment subject to immediate appeal." *Behrens v. Pelletier*, 516 U.S. 299, 307 (1996); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) ("[W]e hold that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."). Qualified immunity only extends to "government officials performing discretionary functions." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 970 (6th Cir. 2004). Accordingly, the district court's denial of the motion to dismiss is an appealable final order as applied to the individual defendants — Wray and Zigler — but not the municipal defendant — the Board.

In any event, the district court's denial of the motion to dismiss the Board was not in error. As noted above, the allegations of the Complaint and the reasonable inferences therefrom are sufficient to support that Evans-Marshall engaged in constitutionally protected activity. The Board's approval of Evans-Marshall's termination is an injury that would chill First Amendment expression. Evans-Marshall also specifically alleges that the Board's decision was at least partly motivated by the protected activity. As with the individual defendants, the Board's rebuttal that the termination was for legitimate, non-discriminatory reasons cannot be considered without some factual discovery.

## V. Conclusion

For these reasons, this Court **AFFIRMS** the judgment of the district court.

---

**CONCURRENCE**

---

SUTTON, Circuit Judge, concurring. I concur in Judge Cole's opinion, which accurately follows our cases and this complaint where they lead us. I write separately to explain what is (and what is not) at issue in this case, why our cases compel the rejection of the defendants' motion to dismiss the complaint for failure to state a claim and why this case illustrates to me that our circuit should re-examine its First Amendment jurisprudence in the context of in-class curricular speech.

First, whatever else Evans-Marshall may complain about when it comes to the school district's oversight of her curricular choices in teaching high school English, she may not complain about the school district's infringement of her free-speech rights when it came to the assignment of *To Kill a Mockingbird*, *Siddhartha* and *Fahrenheit 451*. These books, quite understandably, appeared on the school district's list of books approved for high school English. When Evans-Marshall asked her students to read these classics, it thus was not her speech that was at issue but the school district's. And, indeed, her complaint never says that the school district based its decision to terminate her on the ground that she taught books that the school district said she could. What her complaint does say is that the school district terminated her based on the *methods* she used in teaching these books and in discussing them in class.

Second, our case law permits such a cause of action, allowing primary and secondary public school teachers to bring a First (and Fourteenth) Amendment retaliation claim in response to a termination decision arising from their methods of teaching and from their in-class curricular speech. Like the court today, I can find no ground at this early stage in the litigation to distinguish *Cockrel v. Shelby County School District*, 270 F.3d 1036 (6th Cir. 2001), which held that a fifth-grade teacher had a First Amendment right to invite an actor into her classroom to give a presentation about industrial hemp. *Id.* at 1055. No principled distinction exists between an in-class presentation by a visiting speaker, which is one method of teaching, and an in-class discussion of reading materials, which is another. And no principled distinction exists between the matter of public concern at stake in *Cockrel* (the virtues of industrial hemp) and the themes of racial justice, spiritual awakening and government censorship that Evans-Marshall discussed while teaching *To Kill a Mockingbird*, *Siddhartha* and *Fahrenheit 451*.

Given our case law, the path that Judge Cole has taken in resolving this dispute is the path that has been charted for us. And that is all the more true when one accounts for the balancing test that governs these claims and for the preliminary stage of this litigation. Our cases first ask whether the teacher's speech "touches on a matter of public concern." *See Cockrel*, 270 F.3d at 1053. They then ask whether "the employee's interest in speaking" outweighs "the employer's interest in regulating the speech" to determine if the speech is constitutionally protected. *Id.*; *see Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). In the absence of discovery concerning why the teacher spoke and why the school district restricted her speech, it is difficult to understand how a court has any choice but to deny a motion to dismiss premised on the contention that no constitutional violation occurred.

Individual defendants likewise will only rarely be able to establish that the right was not "clearly established" at this stage of the dispute. The case-by-case, incremental decisionmaking of balancing tests, it is true, infrequently will provide the "fair notice" that qualified-immunity precedent requires, as each case may contain unique employee interests in speaking and unique employer concerns in restricting the speech. *See Brosseau v. Haugen*, 125 S. Ct. 596, 599 (2004) (noting that, unless the case is an "obvious one" or "clearly established" in a "particularized sense," "fair warning" for qualified immunity cannot be found in "general tests"); *Lyons v. City of Xenia*,

417 F.3d 565, 579–80 (6th Cir. 2005). But just as these considerations frequently will make it difficult for a plaintiff to surmount a qualified-immunity defense *after discovery*, so they make it difficult for a defendant to claim qualified immunity on the pleadings *before discovery* and before the parties (much less the courts) know what is being balanced against what. *See McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004); *Jacobs v. City of Chicago*, 215 F.3d 758, 774–76 (7th Cir. 2000) (Easterbrook, J., concurring); *see also Behrens v. Pelletier*, 516 U.S. 299 (1996). Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is "obvious" or "squarely govern[ed]" by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not.

Third, while I am prepared to accept these conclusions in this case, I respectfully believe that our circuit should re-think the way it has applied *Connick* and *Pickering* to in-class curricular speech. The Supreme Court has never held that the First Amendment applies to a teacher's classroom speech, and there is good reason to think that it would not do so. In *Connick*, the Court said that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." 461 U.S. at 147. *Connick*, then, draws two dichotomies: (1) between speech by public employees acting as "employees" and speech by public employees acting as private "citizens"; and (2) between speech "on matters of public concern" and speech "upon matters of personal interest." When public school teachers speak as "employees," even when they speak on "matters of public concern," the First Amendment thus does not protect their speech under *Connick*, a conclusion that respects the reality that it is the employer (not the employee) who bears ultimate responsibility for what goes on in the classroom, the reality that virtually all speech by public school teachers in the classroom involves speech in the teacher's capacity as an employee and the reality that many public school teachers (consider English, History and Government teachers) speak about "matters of public concern" virtually every day of the school year. Only when teachers speak as private citizens on matters of public concern does the First Amendment and the *Pickering* balancing test apply.

When, by contrast, teachers "speak in the course of carrying out their routine, required employment obligations, they have no *personal* interest in the content of that speech." *Ceballos v. Garcetti*, 361 F.3d 1168, 1189 (9th Cir. 2004) (O'Scannlain, J., concurring), *cert. granted*, 125 S. Ct. 1395 (2005). The school district bears responsibility for the speech, and for First Amendment purposes it therefore is the speaker and it therefore has the right to retain control of the speech—or, more precisely, to retain control over what is being taught in the classroom. *See id.*; *cf. Rust v. Sullivan*, 500 U.S. 173 (1991); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995) (holding that "[w]hen the government appropriates public funds to promote a particular policy of its own," it may "say what it wishes" and "may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee").

To my knowledge, no other circuit has applied the *Pickering* balancing test to in-class speech of this sort. Some circuits have adopted the analysis that I have outlined above. *See Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998) ("[A] public university professor does not have a First Amendment right to decide what will be taught in the classroom."); *Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 366 (4th Cir. 1998) (en banc) (holding that "a public high school teacher [does not have] a First Amendment right to participate in the makeup of the school curriculum through the selection and production of a play"); *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 795 (5th Cir. 1989) (holding that "the first amendment does not vest public school teachers with authority to disregard established administrative mechanisms for approval of reading lists"). And some circuits have extended the Supreme Court's more lenient test for assessing *student* in-class speech, *see Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), to teacher in-class speech, though to my knowledge none of these circuits has upheld a First Amendment claim in this

area. *See Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 719 (8th Cir. 1998) (holding that "a school district does not violate the First Amendment when it disciplines a teacher for allowing students to use profanity . . . in their written work"); *Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719, 724 (2d Cir. 1994) (holding that a teacher does not have a "First Amendment right to use a film-clip showing bare-breasted women in a lecture to a tenth-grade mathematics class"); *Ward v. Hickey*, 996 F.2d 448, 453 (1st Cir. 1993) (analyzing teacher in-class speech under the *Hazelwood* standard); *Bishop v. Aronov*, 926 F.2d 1066, 1074 (11th Cir. 1991) (holding that "the University's interests in the classroom conduct of its professors are sufficient . . . to warrant the reasonable restrictions it has imposed" on a professor and that "[t]he University must have the final say in such a dispute"); *Miles v. Denver Pub. Sch.*, 944 F.2d 773 (10th Cir. 1991) (holding that a school board may regulate a teacher's in-class speech); *Webster v. New Lenox Sch. Dist. No. 122*, 917 F.2d 1004, 1008 (7th Cir. 1990) ("Given the school board's important pedagogical interest in establishing the curriculum and legitimate concern with possible establishment clause violations, the school board's prohibition on the teaching of creation science to junior high students was appropriate."). Two circuits, it is true, have applied *Pickering* in what could be described as educational settings. *See Goldwasser v. Brown*, 417 F.2d 1169 (D.C. Cir. 1969) (applying *Pickering* to government employee terminated because of the manner in which he taught foreign service officers); *Nicholson v. Bd. of Educ. Torrance Unified Sch. Dist.*, 682 F.2d 858 (9th Cir. 1982) (applying *Pickering* to teacher terminated because of decisions he made as the high school's newspaper advisor). But both cases fail to address pure in-class curricular speech by a primary or secondary school teacher, and both cases at any rate rejected the claims. Contrary to the suggestion of the majority opinion, *Givahn v. Western Line Consolidated School District*, 439 U.S. 410 (1979), does not establish any presumptions about how to handle the First Amendment implications of in-class speech but instead deals with private comments between a teacher and principal made outside of class.

Not only do the terms of the *Connick* inquiry support the position that localities should be able to determine what teachers may (and may not) say in class, so also does the Supreme Court's tradition of deferring to local school boards with regard to educational matters. "In the First Amendment arena and other arenas as well, the Supreme Court [ ] has frequently emphasized that public schools have considerable latitude in fashioning rules that further their educational mission." *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 393 (6th Cir. 2005). "The very complexity of the problems of . . . managing a statewide public school system suggests that there will be more than one constitutionally permissible method of solving them," *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42 (1973) (quotations omitted), which is why "the determination of what manner of speech in the classroom . . . is inappropriate properly rests with the school board rather than with the federal courts," *Hazelwood*, 484 U.S. at 267 (citation and quotations omitted); *cf. Sweezy v. New Hampshire*, 354 U.S. 234, 255 (1957) (Frankfurter, J., concurring) (noting that a university should "determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study"); *Boring*, 136 F.3d at 371 (Wilkinson, J., concurring) ("Traditionally, indeed for most of our history, education has been largely a matter of state and local concern."). As today's case illustrates, our circuit's decisions in this area risk "remov[ing] from students, teachers, parents, and school boards the right to direct their educational curricular through democratic means. The curricular choices of the schools should be presumptively their own—the fact that such choices arouse deep feelings argues strongly for democratic means of reaching them." *Boring*, 136 F.3d at 371–72.

No less importantly, this approach accords with the realities of the classroom. To say that the First Amendment applies to classroom speech—and, as here, to the methods by which teachers teach their courses—is to say that the provision applies to almost everything a teacher does from the first ring of the school bell to the last. Vital as the free-speech guarantee is to American government, no school operates *solely* on Justice Holmes' premise that "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United*

*States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). Only a structured curriculum permits each school to advance its educational mission, which includes the assignment and discussion of works in class—the very activities about which Evans-Marshall complains and over which she claims a First Amendment interest. A school may, for the most simple reasons or the most complex, prefer Shakespeare to *Siddhartha* or Faulkner to *Fahrenheit 451*. A school may prefer that the books be taught sequentially, believing that *To Kill a Mockingbird* is appropriate for 13-year-olds but that *Siddhartha* becomes appropriate only a few years after that. A school may prefer that its teachers discuss certain themes from literary works, and not others, in the time allocated for each class. And a school may believe certain materials or themes not appropriate for young children, preferring them to be brought out at a later point in a child's development.

Taken seriously, however, the application of the free-speech guarantee to in-class curricular speech not only undermines these basic assumptions about the management of our schools but also risks transforming many employment disputes into First Amendment retaliation claims. What terminations arising from an employee's *method* of teaching will not involve speech or, as Evans-Marshall puts it, "academic freedom"? May a teacher claim that a school board's requirement that the teacher discuss certain materials in class impermissibly *compels* his speech? *Cf. West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). May a teacher insist on assigning materials that some may perceive as racist and insist on discussing them when the school board has told him not to? May a teacher raise a controversial topic (say, intelligent design) when a school board has told him not to? May a teacher insist on introducing mature sexual themes when discussing a work of literature when a school board has told him not to? Does a music teacher retain veto power over that most controversial of school productions—the Holiday Concert? And in the end does every disagreement in this area "plant the seed of a constitutional case"? *Connick*, 461 U.S. at 149.

It is precisely because "one man's vulgarity is another's lyric," *Cohen v. California*, 403 U.S. 15, 25 (1971), that parents long have insisted that school boards and school administrators retain control over the curriculum and the methods of teaching it to their impressionable children. Permitting federal courts to distinguish classroom vulgarities from lyrics or to decide whose method of teaching *Siddhartha* is superior—the school district's or Evans-Marshall's—not only disenfranchises the 9,000 or so members of the Tipp City community but also tests the boundaries of judicial competence. If even the most happily married parents cannot agree on what and how their own children should be taught, as I suspect is not infrequently the case, what leads anyone to think the federal judiciary can answer these questions? Submitting issues of this sort to the federal courts is not a sensible way to make decisions about the books that children read in public school or about the way books are taught in school, and it is not something that the Constitution mandates. Because it is the method that our circuit's case law appears to have adopted, however, I respectfully concur in today's opinion.

---

### CONCURRING IN PART, DISSENTING IN PART

---

ZATKOFF, District Judge, concurring, in part, and dissenting, in part. I concur in Judge Cole's majority opinion, which faithfully applies this circuit's precedent in *Cockrel v. Shelby County School District*, 270 F.3d 1036 (6th Cir. 2001) to the present facts. In addition, I concur in Judge Sutton's concurring opinion, which calls for a re-examination of this circuit's First Amendment jurisprudence regarding in-class curricular speech. I disagree with the majority insofar as it would deny qualified immunity to the individual defendants. Because I find that the alleged Constitutional violation was not "clearly established," I would grant qualified immunity to the individual defendants. Accordingly, I respectfully dissent as to this issue.

Government officials performing discretionary functions are shielded from liability for civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The issue of qualified immunity is a question of law. *Harlow*, 457 U.S. at 818. The burden is on the plaintiff to demonstrate that the individual defendants are not entitled to qualified immunity. *See Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

The majority opinion extensively analyzed the issue of whether Plaintiff's complaint asserted a constitutional violation. Following Sixth Circuit cases, it applied the *Pickering* balancing test, weighing the employee's interest in speaking against the employer's interest in regulating the speech, and ultimately concluded that Plaintiff's complaint sufficiently asserted a constitutional violation.

The majority then moved on to the issue of whether the constitutional right in question was "clearly established." It concluded:

> Under a liberal reading of the Complaint, Evans-Marshall was terminated due to a public outcry engendered by the assignment of protected material that had been approved by the Board. Such a claim dovetails with previous, meritorious claims in this circuit. *See Cockrel*, 270 F.3d at 1054-55; *Stachura*, 763 F.2d at 214-15.

Majority Opinion, at 13-14.

Though *Cockrel* and *Stachura* did involve successful First Amendment claims, I do not believe these cases can be said to have "clearly established" a constitutional violation in the present case. A number of circuit courts of appeal have explained that constitutional rights which require a particularized balancing test, such as the *Pickering* balancing test in this case, will rarely be "clearly established" for qualified immunity purposes. *See Demeglio v. Haynes*, 45 F.3d 790, 806 (4th Cir. 1995) ("[O]nly infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, difficult to apply, and not yet well-defined."); *see also Connick*, 461 U.S. at 154, ("'We do not deem it either appropriate or feasible to attempt to lay down a general standard against which all statements may be judged.'") (quoting *Pickering*, 391 U.S. at 569); *see also Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992) ("In determining whether the law was clearly established, we bear in mind that allegations of constitutional violations that require courts to balance competing interest may make it more difficult to find the law 'clearly established' when assessing claims of qualified immunity."); *Borucki v.*

*Ryan*, 827 F.2d 836, 848 (1st Cir. 1987) ("When the law requires a balancing of competing interest, . . . it may be unfair to charge an official with knowledge of the law in absence of a previously decided case with clearly analogous facts."); *Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir.) ("If the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent."); *Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir.) (A constitutional rule that "involves the balancing of competing interests" is "so fact dependent that the 'law' can rarely be considered 'clearly established.'"). I would follow these cases and conclude that Evans-Marshall's alleged Constitutional violation has not yet been "clearly established."

In addition, I find that the holdings of *Cockrel* and *Stachura* were limited to the facts before them and were very narrow. In *Cockrel*, the Court concluded: "[W]e hold that, on balance, the defendants' interests in an efficient operation of the school and a harmonious workplace do not outweigh the plaintiff's interests in speaking about the benefits of industrial hemp, an issue of substantial political and economic concern in Kentucky." Such a narrow holding may have clearly established a teacher's right to discuss the benefits of industrial hemp in the classroom, but it should not be read to have clearly established a broad constitutional right regarding "in the classroom" teacher speech.

The concurring opinion of Judge Sutton also addressed the question of qualified immunity, stating that though it is "difficult for a plaintiff to surmount a qualified-immunity defense *after discovery*," it is also "difficult for a defendant to claim qualified immunity on the pleadings *before discovery* and before the parties (much less the courts) know what is being balanced against what." Concurring Opinion, at 3.

I am not persuaded with a before/after discovery distinction. There is no inherent difficultly in determining qualified immunity on a motion to dismiss. The district court simply must determine the defendant's conduct based on the facts as alleged in Plaintiff's complaint. *See Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) ("At that earlier stage, it is the defendant's conduct as *alleged in the complaint* that is scrutinized for 'objective legal reasonableness.' On summary judgment, however, the plaintiff can no longer rest on the pleadings, *see* Fed. Rule Civ. Proc. 56, and the court looks to the evidence before it (in the light most favorable to the plaintiff) when conducting the *Harlow* inquiry."). Granting Plaintiff all the factual inferences from her Complaint, I nevertheless find that the alleged conduct does not amount to a "clearly established" constitutional violation due to the inherent difficulty in applying the *Pickering* balancing test.

For the above reasons, I would grant qualified immunity to individual defendants Wray and Zigler. Because I disagree with the majority's conclusion as to this issue, I respectfully dissent.