RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0267P (6th Cir.)
File Name: 01a0267p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

KENNETH E. HARDY,
       *Plaintiff-Appellee,*

    *v.*

No. 00-5198

JEFFERSON COMMUNITY
COLLEGE and KENTUCKY
COMMUNITY AND TECHNICAL
COLLEGE SYSTEM,
       *Defendants,*

MARY PAMELA BESSER and
RICHARD GREEN,
       *Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 99-00477—Charles R. Simpson III,
Chief District Judge.

Argued: June 8, 2001

Decided and Filed: August 15, 2001

Before: KEITH, NORRIS, and GILMAN, Circuit Judges.

1

———————————

## COUNSEL

**ARGUED:** Holland N. McTyeire, GREENEBAUM, DOLL & McDONALD, Louisville, Kentucky, for Appellants. Glenn A. Cohen, SEILLER & HANDMAKER, Louisville, Kentucky, for Appellee. **ON BRIEF:** Holland N. McTyeire, Melissa Norman Bork, GREENEBAUM, DOLL & McDONALD, Louisville, Kentucky, for Appellants. Glenn A. Cohen, Lise G. Buba-Kruer, Adi Trbonja, SEILLER & HANDMAKER, Louisville, Kentucky, for Appellee.

———————————

## OPINION

———————————

RONALD LEE GILMAN, Circuit Judge. Kenneth E. Hardy, a Caucasian adjunct instructor at Jefferson Community College, brought suit against the College, Kentucky Community and Technical College System, College President Richard Green, and former Acting Dean Mary Pamela Besser pursuant to 42 U.S.C. § 1983, alleging that the defendants retaliated against him for exercising his constitutionally protected right of free speech. Following a classroom discussion examining the impact of such oppressive and disparaging words as "nigger" and "bitch," one of Hardy's African-American students complained to her minister, a local civil-rights activist. When the minister threatened that African-American enrollment would decline unless the dispute was resolved to the satisfaction of the complaining student, Hardy's teaching contract was not renewed.

The district court dismissed all of Hardy's claims against the College, as well as against Green and Besser in their official capacities, but rejected Green's and Besser's contention that they were entitled to qualified immunity in their individual capacities as a matter of law. Green and Besser now challenge that decision on interlocutory appeal.

they are inappropriate for consideration on interlocutory appeal. *See Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998) (dismissing the appeal "because there is clearly a factual dispute at the heart of the qualified immunity issue").

Assuming that Green and Besser retaliated against Hardy based upon the content of his classroom discourse, such conduct was, as a matter of law, objectively unreasonable. Green and Besser, however, may defend against Hardy's claim by presenting proof that his contract was not renewed for permissible academic reasons, but that defense involves a disputed issue of material fact that cannot be resolved at this time.

## IV. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

Moreover, it is "the advancement of knowledge, the transformation of taste, political change, cultural expression, and the other objectives, values, and consequences of the speech that is protected by the First Amendment." *Id*. at 1251.

The *Dambrot* court then distinguished the coach's motivational use of the "N" word with the speech of two professors who had made racially derogatory remarks. Such speech by the professors, however repugnant, had as its purpose the influencing of public opinion and was therefore constitutionally protected. *See Dambrot*, 55 F.3d at 1189. Finally, the court emphasized that Dambrot's "position as coach is somewhat different from that of the average classroom teacher . . . whose primary role is to guide students through the discussion and debate of various viewpoints in a particular discipline." *Id*. at 1190. Given this court's indepth analysis of the protections available to one using the "N" word in an academic context, reasonable school officials should have known that such speech, when it is germane to the classroom subject matter and advances an academic message, is protected by the First Amendment.

Green and Besser next claim that the district court erred when it failed to consider a "fact-specific approach" to the issue of whether they were entitled to qualified immunity. In support of this argument, they point to what would indeed amount to the College's legitimate pedagogical interests in controlling its course curriculum and evaluating the teaching methodology used in its classrooms. They fail to acknowledge, however, that whether these factors entered into their decision not to renew Hardy's contract remain in dispute. Hardy has alleged that it was purely his classroom speech that motivated the employment decision. Green and Besser are now attempting to transform these factual issues into the legal question of objective reasonableness. Due to the parties' competing versions of the facts, however, these are issues that must be considered by a factfinder when weighing the merits of Hardy's retaliation claim. As such,

For the reasons set forth below, we **AFFIRM** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual background

In January of 1995, Jefferson Community College hired Hardy as an adjunct instructor to teach in its communications program. He was responsible for two courses, Basic Public Speaking and Introduction to Interpersonal Communication. The College continued to renew Hardy's teaching contract each semester thereafter. He received consistently outstanding student evaluations and strong reviews from his superiors. In May of 1998, Hardy was informed that he would be assigned three sections during the upcoming fall semester, although he was not asked to sign a contract at that time.

During the summer semester of 1998, he was again teaching Introduction to Interpersonal Communication. His twenty-two students included nine African-Americans, one of Asian descent, and a foreign exchange student from Switzerland. On July 16, he presented his standard lecture on language and social constructivism, where the students examined how language is used to marginalize minorities and other oppressed groups in society. The lecture included a discussion and analysis of words that have historically served the interests of the dominant culture in which they arise. Hardy solicited from his students examples of such terms. Among their suggestions were the words "girl," "lady," "faggot," "nigger," and "bitch." According to Hardy and other members of the class, the discussion was academically and philosophically challenging. Almost every student participated in the exercise.

One African-American student, however, objected to the in-class use of the words "nigger" and "bitch," and complained to Hardy and his superiors. The student found the exercise to

be in direct contravention of Hardy's stated policy prohibiting the use of offensive language in class. This policy was set forth in the written syllabus that Hardy distributed on the first day of class, which read in pertinent part as follows: "In order to make all class members comfortable enough to participate, there will be no abusive (i.e. sexist, racist, otherwise derogatory) language in discussion."

Although Hardy apologized to the complaining student for any discomfort that the class had caused her, the student contacted Reverend Louis Coleman, a local civil-rights activist, to voice her objection to the gender and racial slurs used in the class. Coleman, in turn, arranged a meeting with College President Green and the student to make Green aware of the student's complaint and to ask that "corrective action be taken." During the meeting, Coleman informed Green that he would not "allow our kids to come to an institution and be berated with the 'N' word and the 'B' word."

On July 21, 1998, former Acting Dean Besser met with Hardy to discuss the student's concerns. She specifically asked why the word "nigger" was used in class when his syllabus forbade such racist or derogatory language. Although Hardy attempted to explain that this and other words were analyzed as illustrations of highly offensive, powerful language, and that it was not used in an "abusive" manner, Besser continued to challenge Hardy regarding the classroom discussion. Hardy then asked Besser if there was anything he could do to rectify the situation. Rather than responding to his question, she informed him that a "prominent citizen" representing the interests of the African-American community had become involved and had threatened to affect the school's already-declining enrollment if corrective action was not taken.

Hardy finished teaching the course as scheduled in the summer semester. On August 23, 1998, Dr. Denise Gray, the Assistant Dean of Students for the College, wrote Hardy to inform him that the matter had been resolved to the

discussed above, our review is limited to whether, in light of clearly established law, it was objectively reasonable for Green and Besser to believe that not renewing Hardy's contract in retaliation for his in-class speech was lawful. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

There is no doubt that the right allegedly violated in this case, based on the freedom of speech protected by the First Amendment, is one of our most fundamental and established constitutional rights. For decades it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion, persuasion, or intimidation "that cast a pall of orthodoxy" over the free exchange of ideas in the classroom. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967); *cf. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977); *Bd. of Regents v. Roth*, 408 U.S. 564, 574-75 (1972); *Perry v. Sindermann*, 408 U.S. 593, 596-98 (1972); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Despite this overwhelming precedent, Green and Besser argue that the right was not clearly established because no court had specifically addressed whether a public university could decline to renew a contract based solely on a professor's in-class use of "sexist and racially derogatory language."

Six years ago, however, this court in *Dambrot* held that "[t]he linchpin of the inquiry . . . for both public concern and academic freedom [is] the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1189 (6th Cir. 1995). The court then cited with approval the Seventh Circuit's determination in *Swank v. Smart*, 898 F.2d 1247 (7th Cir. 1990), that "[t]he purpose of the free-speech clause . . . is to protect the market in ideas, broadly understood as the public expression of ideas, narratives, concepts, imagery, opinions—scientific, political, or aesthetic—to an audience whom the speaker seeks to inform, edify, or entertain." *Id*. at 1250-51 (internal citation and quotation marks omitted).

Twenty years later, in *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 508-09 (1969), the Court echoed *Terminiello*'s rationale in rejecting a school district's argument that the wearing of black armbands by some of the students might provoke a disturbance. The Court stated:

> [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. . . . Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, and our history says that it is this sort of hazardous freedom -- this kind of openness -- that is the basis of our national strength and of the independence and vigor of Americans.

*Id.* at 508-09 (internal citation omitted).

The alleged circumstances surrounding Hardy's termination appear to present a classic illustration of "undifferentiated fear" of disturbance on the part of the College's academic administrators. Only after Reverend Coleman voiced his opposition to the classroom discussion did Green and Besser become interested in the subject matter of Hardy's lecture. Just like the school officials in *Tinker*, Green and Besser were concerned with "avoid[ing] the discomfort and unpleasantness that always accompany" a controversial subject. *Id.* at 509. On balance, Hardy's rights to free speech and academic freedom outweigh the College's interest in limiting that speech. Hardy, therefore, has satisfied both prongs of the *Pickering* test in successfully alleging a First Amendment violation by a public employee.

### 2. *Qualified immunity defense*

Green and Besser next argue that they are entitled to qualified immunity because reasonable school officials could have disagreed about whether, and to what extent, Hardy's classroom speech was protected by the First Amendment. As

satisfaction of the complaining student. Around the same time, Besser left a message on Hardy's home answering machine stating that "there were no classes" for him to teach in the Fall 1998 semester.

At Hardy's request, Green and Besser met with Hardy to discuss the issue in early September of 1998. They informed him that the matter had been resolved to the student's satisfaction, but they declined to elaborate further. Hardy was never again asked to teach at the College.

### B.   Procedural background

On July 23, 1999, Hardy filed suit pursuant to 42 U.S.C. § 1983, alleging that the defendants had violated his rights under the First and Fourteenth Amendments to the United States Constitution. Hardy's complaint contended that the defendants had retaliated against him for exercising his rights of free speech and academic freedom. He also asserted several state-law causes of action, including defamation, conspiracy, breach of contract, and tortious interference with his and the College's continuing business relationship.

The defendants filed a timely motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting various grounds for dismissal. First, the College, as well as Green and Besser in their official capacities, argued that Hardy's claims were barred by the Eleventh Amendment to the United States Constitution and by sovereign immunity as provided in Section 231 of the Kentucky Constitution. Because the College is an arm of the state of Kentucky, and because any judgment against either the College or Green and Besser in their official capacities would be paid out of the state treasury, the district court granted this portion of the defendants' motions, excepting only those claims praying solely for prospective injunctive relief.

Second, Green and Besser claimed that they were entitled to qualified immunity in their individual capacities because

Hardy had no constitutional right to use the "N" word and the "B" word, and that they had the right to terminate him for using such language. The district court denied their motion, holding that Hardy's speech touched upon "a matter of public concern" and that a public employee's right to speak on such matters has been clearly established by the Supreme Court. In a related ruling, the court denied the defendants' motion to dismiss Hardy's state-law conspiracy claim. Despite their argument that he had failed to allege any unlawful act that would support a conspiracy claim, the court held that, if Hardy could show that they had retaliated against him for exercising his constitutional rights, he would satisfy the state-law conspiracy requirement.

Finally, the district court determined that Hardy had failed to plead sufficient facts to support his Fourteenth Amendment equal-protection and procedural-due-process claims, or his state-law claims of defamation, tortious interference with a contractual relationship, and breach of contract. It therefore granted the defendants' motion to dismiss all of these latter claims.

Green and Besser then filed a motion to alter or amend the district court's ruling that they were not entitled to qualified immunity, asserting that "the right to free speech *in the classroom setting* is not clearly established." (Emphasis in original.) Again the district court denied their motion, finding the argument "to be a distinction without a difference." The court also denied Green's and Besser's motion to reconsider its ruling on Hardy's state-law conspiracy claim. Green and Besser have filed this interlocutory appeal to challenge the district court's denial of their qualified-immunity defense.

interest in limiting a teacher's speech is not great when those public statements "are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." *Pickering*, 391 U.S. at 572-73.

Green and Besser, however, rely on *Hetrick v. Martin*, 480 F.2d 705 (6th Cir. 1973), to support their assertion that the College had an absolute right to evaluate Hardy's method of instruction. In *Hetrick*, this court found that no First Amendment interests were implicated when a state university did not renew the contract of a nontenured professor because her pedagogical style and teaching methods did not conform to the university's standards. *See id.* at 708. But *Hetrick* is easily distinguishable because the district court had made significant findings of fact related to the administration's dissatisfaction with Hetrick's teaching methods and ability. Numerous students had complained about "their inability to comprehend what she was attempting to teach them or what was expected of them." *Id*. at 706. Significantly, the court noted that had Hetrick been able to "adequately corroborate" her claim that the nonrenewal was based on statements made in class related to the Vietnam War and the military draft, relief might have been proper. *See id*. at 708.

As further justification for Hardy's termination, Green and Besser point to the potential disruption in school operations and enrollment that might have occurred had Reverend Coleman become more involved in the matter. The Supreme Court, however, in *Terminiello v. City of Chicago*, 337 U.S. 1 (1949), pronounced that a function of the First Amendment "is to invite dispute. . . . Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment." *Id*. at 4 (internal citation omitted).

paramount in the academic setting"); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) (holding that the "First Amendment's protection of academic freedom" applies to teachers' in-class discussions).

We next focus on the College's interest in promoting efficiency in the educational services that it provides and in avoiding disruption to its operations. *Pickering* counsels that courts should consider whether an employee's comments meaningfully interfere with the performance of his duties or with the employer's general operations, undermine a legitimate goal or mission of the employer, create disharmony among coworkers, undercut an immediate supervisor's discipline over the employee, or destroy the relationship of loyalty and trust required of confidential employees. *See Pickering*, 391 U.S. at 569-70; *see also Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994) (denying the defendants' qualified immunity claims because "no reasonable official . . . could conclude that [the state's interest in preventing workplace disruption] outweighed Williams' interest in speaking freely on matters of political patronage and political corruption").

The discussion of the offensive words at issue was limited to a single lecture in Hardy's class. Despite the presence of nine African-Americans and one student of Asian descent, only one student objected. Hardy continued teaching his courses throughout the semester without any conflict, and all of his students but the one in question provided positive feedback on his classroom instruction. There is no indication that the lecture undermined Hardy's working relationship within his department, interfered with his duties, or impaired discipline.

As noted earlier, the speech did have the effect of creating disharmony between Hardy and the College administrators, as evidenced by the contentious July 1998 meeting between Besser and Hardy and by the College's decision not to renew his contract. *Pickering* counsels, however, that a school's

## II.  JURISDICTION

Under 28 U.S.C. § 1291, this court has jurisdiction to hear appeals from "final decisions" of the district court. As the Supreme Court has explained, however, "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). The Court emphasized, however, that appellate jurisdiction over these interlocutory appeals is confined to the "purely legal" question of "whether the facts alleged . . . support a claim of violation of clearly established law." *Id.* at 528 n.9. We therefore have jurisdiction over Green's and Besser's appeal so long as our review is confined to the "purely legal" question of whether the facts as alleged by Hardy show a violation of his clearly established rights.

## III.  ANALYSIS

### A.  Standard of review

The doctrine of qualified immunity shields government officials from liability, as well as from suit, so long as their official conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A district court must engage in a two-step inquiry when determining whether a state actor is entitled to qualified immunity. First, the court must ask whether the plaintiff in the civil action has demonstrated the violation of a constitutionally protected right. Green and Besser question whether Hardy's use of "racially derogatory and sexist language" in the classroom constituted speech protected by the First Amendment, thereby raising a question of law properly reviewable on interlocutory appeal. *See Johnson v. Jones*, 515 U.S. 304, 317 (1995) (holding that the denial of qualified immunity is reviewable on interlocutory appeal only if the case presents "abstract issues of law"). Second, the

court must examine "whether the right is so 'clearly established' that a reasonable official would understand that what he is doing violates that right." *Brennan v. Township of Northville*, 78 F.3d 1152, 1154 (6th Cir. 1996) (citation omitted).

Although qualified immunity is typically addressed at the summary judgment stage of the case, the defense may be raised and considered on a motion to dismiss.  The motion will be granted if the complaint fails to allege the violation of a clearly established constitutional right.  *See Stemler v. City of Florence*, 126 F.3d 856, 866-67 (6th Cir. 1997). Whether the complaint alleges such a violation is a question of law which we review *de novo,* accepting the facts alleged in the complaint as true and drawing all reasonable inferences therefrom in the plaintiff's favor. *See Spurlock v. Satterfield*, 167 F. 3d 995, 1000 (6th Cir. 1999).

**B.   The district court did not err in denying Green's and Besser's motion to dismiss on the basis of qualified immunity**

In this appeal, Green and Besser raise two different issues for our review.   First, they challenge the district court's holding that Hardy's in-class speech involved a matter of public concern, thus falling within the protections of the First Amendment.  Second, they contend that reasonable officials could have disagreed on whether, and to what extent, Hardy's speech was constitutionally protected.

Green and Besser also maintain that Hardy's contract was not renewed because of his objectionable teaching methods, and that this case therefore involves nothing more than an internal employment dispute.  In order for this court to retain jurisdiction, however, Green and Besser "must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to [Hardy's] case." *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998).  The facts as alleged by Hardy directly contravene this attempt to

In balancing the competing interests involved, we must take into account the robust tradition of academic freedom in our nation's post-secondary schools.   As the Supreme Court proclaimed more than thirty years ago:

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned.  That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.

*Keyishian v. Bd. of Regents,* 385 U.S. 589, 603 (1967) (internal citations and quotation marks omitted).  The Court has long recognized that educational institutions occupy a unique place in First Amendment jurisprudence. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (noting that "the unmistakable holding of this Court for almost 50 years" has been that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students"); *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our society will stagnate and die.").

In light of these precedents, the argument that teachers have no First Amendment rights when teaching, or that the government can censor teacher speech without restriction, is totally unpersuasive. *See Scallet v. Rosenblum,* 911 F.Supp. 999, 1013-14 (W.D.Va.1996) ("To suggest that the First Amendment, as a  matter of law, is never implicated when a professor speaks in class, is fantastic.").   This circuit, following Supreme Court direction, has similarly held that a teacher's in-class speech deserves constitutional protection. *See Bonnell*, 241 F.3d at 823 (holding that "a professor's rights to academic freedom and freedom of expression are

rational discourse that allows them to participate meaningfully in public debate). Hardy's lecture on social deconstructivism and language, which explored the social and political impact of certain words, clearly meets this criterion. Although Hardy's in-class speech does not itself constitute pure public debate, it does relate to matters of overwhelming public concern -- race, gender, and power conflicts in our society. *See, e.g., Bonnell*, 241 F.3d at 816 (holding that "the subject of profane classroom language which precipitates a sexual harassment complaint lodged against the instructor . . . involves a matter of public import"); *Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir. 1994) (holding that a law school professor's "speech advocating the legalization of marijuana, criticizing national drug-control policy, and debating civil disobedience on its face implicates matters of public concern").

Hardy has thus satisfied the first prong of the two-part test set forth in *Pickering*. We therefore turn to the second prong, balancing Hardy's right to speak on a matter of public concern against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Although the district court's order did not detail its analysis under the *Pickering* balancing test, it found no evidence that "Hardy's speech was having a negative impact upon [the school's interest in] efficiency."

Hardy claims that his right to free speech and academic freedom outweigh the College's pedagogical interests in restricting a teacher's in-class discussion. Green and Besser maintain that because Hardy's speech was "sexist and racially derogatory," it warranted no constitutional protection. In the alternative, they argue that the College's legitimate interests in avoiding the disruption caused by Hardy's actions and the potential for further disruption as a result of Reverend Coleman's involvement, as well as the need to control course curriculum and the pedagogical methods of the College's instructors, should defeat Hardy's speech interests.

characterize the matter as "nothing more than an ordinary employment dispute." At the July 1998 meeting between Besser and Hardy, Besser questioned Hardy at length about the usage of the "N" word in his classroom discussion. Besser also allegedly informed Hardy that if he "were not a white male, this would not be an issue." As such, we will not consider Green's and Besser's disputed version of the material facts in our analysis.

### 1.　First Amendment retaliation claim

Hardy alleges that Green and Besser violated his First Amendment right to freedom of speech when they failed to renew his contract in retaliation for his in-class discussion of "socially controversial words." The district court found that the use of the racial and gender epithets in an academic context, designed to analyze the impact of these words upon societal relations, touched upon a matter of public concern and thus fell within the First Amendment's protection. Green and Besser contend, however, that Hardy's use of "racially vulgar words" presented no issue of public concern and therefore enjoyed no constitutional protection.

The Supreme Court has long held that a public employee retains his First Amendment right to comment on matters of public concern without fear of reprisal from the government as his employer. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968) (holding that a teacher's comments concerning school funding issues touched upon a matter of public concern and could not provide the basis for dismissal). Furthermore, an employee's untenured status will not defeat constitutional claims. *See Perry v. Sindermann*, 408 U.S. 593, 597-98 (1972) (declaring that a professor's lack of tenure did not defeat the claim that the nonrenewal of his contract was in retaliation for the exercise of his constitutional right to free speech). A public employee may "establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First

Amendment freedoms." *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 283-84 (1977).

As a public employee, Hardy must show that (1) he was disciplined for speech that was directed toward an issue of public concern, and (2) his interest in speaking as he did outweighed the College's interest in regulating his speech. *See Pickering*, 391 U.S. at 568.

In *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court determined that the question of whether a public employee's speech is constitutionally protected turns upon the "public" or "private" nature of such speech. The distinction is based upon the principle that "speech on public issues occupies the highest rung of the heirarchy [sic] of First Amendment values, and is entitled to special protection." *Id*. at 145 (internal citation and quotation marks omitted).

To determine whether an employee's speech addresses a matter of public concern, the court must look to the "content, form, and context of a given statement, as revealed by the whole record." *Id*. at 147-48. Speech that relates "to any matter of political, social, or other concern to the community" touches upon matters of public concern. *Id*. at 146. Furthermore, the court must determine "the *point* of the speech in question . . . [because] [c]ontroversial parts of speech advancing only private interests do not necessarily invoke First Amendment protection." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d, 1177 1187 (6th Cir. 1995) (emphasis in original) (internal quotation and citation omitted).

Relying on this court's recent decision in *Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001), Green and Besser argue that Hardy's use of "racially vulgar words" failed to touch upon a matter of public concern, and therefore was not entitled to protection under the First Amendment. The college professor in *Bonnell*, however, was disciplined for his gratuitous in-class use of the words "pussy," "cunt," and "fuck," which had given rise to a sexual harassment

complaint filed by one of the professor's students. *Id*. at 803. Because Bonnell's offensive language was "not germane to the subject matter," the court concluded that he did "not have a constitutional right to use [these terms] in a classroom setting." *Id*. at 820. Unlike Bonnell's frequent in-class use of gratuitous profanity and offensive language, however, Hardy's speech was germane to the subject matter of his lecture on the power and effect of language. The course was on interpersonal communications, and Hardy's speech was limited to an academic discussion of the words in question.

This case is similarly distinguishable from the facts in *Dambrot*, where the court held that the coach of a state university basketball team did not engage in protected speech when he used the word "nigger" during a locker-room peptalk. *See Dambrot*, 55 F.3d at 1187. The *Dambrot* court found it significant that "Dambrot's use of the N-word was intended to be motivational and was incidental to the message conveyed." *Id*. Dambrot's argument that his speech was protected by academic freedom was rejected because it failed to "advance[] an idea transcending personal interest or opinion which impacts our social and/or political lives." *Id*. at 1189. Unlike Dambrot's motivational use of the "N" word removed from any academic context, Hardy's in-class use of the objectionable word was germane to the subject matter of his lecture on the power and effect of language. Moreover, this and the other offensive words were suggested by the students in the context of the discussion, not gratuitously used by Hardy in an abusive manner.

Because the essence of a teacher's role is to prepare students for their place in society as responsible citizens, classroom instruction will often fall within the Supreme Court's broad conception of "public concern." *See* Gregory A. Clarick, Note, *Public School Teachers and the First Amendment: Protecting the Right to Teach,* 65 N.Y.U.L.Rev. 693, 702 (1990) (arguing that "[a] teacher's speech both offers students ideas and arguments that may be very much a part of public debate and teaches students the process of