NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0136n.06

No. 21-5498

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

MICHELLE HAMMOND-BEVILLE,

      Plaintiff - Appellee

v.

JEFF LANDIS; CHEATHAM COUNTY,
TENNESSEE,

      Defendants,

KATHY MORANTE, RON CARTER; JASON
SHARPE,

      Defendants - Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Mar 29, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

Before: GRIFFIN, DONALD, and BUSH, Circuit Judges.

**BUSH, Circuit Judge.** Appellee Michelle Hammond-Beville serves as a sergeant in the Metropolitan Nashville Police Department ("MNPD"). She alleges that three of the defendants-appellants, fellow MNPD Officers Kathy Morante, Ron Carter, and Jason Sharpe (the "MNPD Defendants"), knowingly subjected her to a baseless internal-affairs investigation on false charges of child abuse. After those charges were dismissed, she sued the MNPD Defendants for the Tennessee tort of malicious prosecution. The MNPD Defendants moved to dismiss her complaint for failure to state a claim and on qualified-immunity grounds, arguing that an internal-affairs proceeding cannot constitute malicious prosecution or that, if it may, no Tennessee case had clearly established that proposition at the time of the alleged misconduct. The district court rejected defendants' arguments. We affirm.

**I.**

For purposes of this interlocutory appeal, the MNPD Defendants have stipulated to the allegations in Hammond-Beville's complaint, and specifically to the district court's recitation of those allegations. *See Gillispie v. Miami Twp.*, 18 F.4th 909, 917 (6th Cir. 2021). In particular, they stipulate to the following passage from the district court's opinion, which they concede accurately describes the allegations in Hammond-Beville's complaint:

> As relevant to the Motion to Dismiss, the Amended Complaint alleges that the plaintiff is married and has two children and two step-children. During the timeframe relevant to this lawsuit, all four children resided with the plaintiff and her husband. In January 2018, one of her stepdaughters, S.B., made a false allegation of child abuse against the plaintiff, which led to an investigation by law enforcement and abuse charges filed against the plaintiff by the Tennessee Department of Children's Services ("DCS") in the Cheatham County Juvenile Court. Defendant [Jeff] Landis[1] [of the Cheatham County Sheriff's Office] was involved in the investigation and reported to Morante that the plaintiff had abused her child. Morante relayed the report to the MNPD command staff, and the MNPD decommissioned the plaintiff on February 2, 2018, pending an internal investigation into the child abuse allegations.
>
> By April 2018, DCS and the Guardian Ad Litem assigned to represent the plaintiff's children's interest in the Cheatham County Juvenile Court proceeding had both independently determined that the abuse allegations were fabricated. DCS moved, on the record, to voluntarily dismiss the abuse petition against the plaintiff, and the Cheatham County Juvenile Court terminated the case with no adverse findings against the plaintiff.
>
> Landis, however, continued to press for criminal prosecution against the plaintiff and "remained in contact with [the Office of Professional Accountability ('OPA')], pressing for Plaintiff to be fired" from the MNPD. In June 2018, Morante, as OPA director, issued a "Notice of Complaint" to the plaintiff, advising her that she was being investigated on suspicion of child abuse based on an allegation by the Cheatham County Sheriff's Office. The Notice of Complaint identified Ron Carter as the OPA Investigator assigned to the case and directed the plaintiff to immediately contact Carter to acknowledge receipt of the Notice and "voice her interest in the matter."

---

[1] Defendant Landis did not move below for dismissal based on qualified immunity, but instead filed an answer. Hammond-Beville's claims against him and against his employer, Cheatham County, are not before us on this appeal.

The Notice also explained that the plaintiff had the option of "avoiding an investigation" by giving a "complete and unwavering truthful admission" of the allegations against her and participating in the MNPD's "Pre-Investigation Settlement Process." The plaintiff did not choose that option, but she fully cooperated with the investigation while continuing to deny the already discredited allegations against her.

Carter completed his draft investigation report and submitted it to Sharpe and Morante in August 2018. Carter's report alleged that the plaintiff had abused her stepdaughter and lied by denying the abuse, relying on Landis'[s] assertions and discounting the conclusions reached by DCS and the children's Guardian Ad Litem. Despite the report's summarizing all of the evidence indicating that the plaintiff was, in fact, not guilty of abuse, Sharpe and Morante both signed off on Carter's conclusion that the plaintiff was guilty of child abuse and dishonesty.[2]

As the plaintiff's direct supervisor, Sharpe was authorized by MNPD policy to make initial charging recommendations for any MNPD disciplinary charges and to recommend sanctions for such charges. Pursuant to that authority, Sharpe completed an MNPD Form 313 "Internal Disciplinary Resolution" on October 23, 2018, listing himself as "Complainant" and formally charging the plaintiff with violations of MNPD Policy 4.20.040, Personal Behavior, (B) Adherence to Law, and MNPD Policy 4.20.040, Personal Behavior, (H) Honesty and Truthfulness. Sharpe recommended a punishment of "dismissal." Morante, in her capacity as OPA Director and being within plaintiff's chain of command, signed off on the Form 313, thus "exercis[ing] final decision-making authority" regarding whether to charge the plaintiff with a disciplinary violation and whether to recommend a sanction.

The plaintiff met with Sharpe on November 5, 2018, for an MNPD "Presentation Meeting" at which Sharpe read the disciplinary charges and advised the plaintiff that the MNPD would be seeking the plaintiff's termination. The plaintiff invoked her right to a ten-day "Reflection Period," and a "Settlement Meeting" was scheduled for November 16, 2018.

The plaintiff met with Sharpe again on November 16 for the Settlement Meeting. At that meeting, the plaintiff pleaded 'not guilty' to the disciplinary charges and requested an administrative hearing with a Disciplinary Advisory Panel. The MNPD defendants, however, never actually scheduled a Disciplinary Advisory Panel hearing, but the plaintiff remained on decommissioned status until the charges against her were finally dismissed without a hearing almost two years later, in September 2020.

For part of the intervening time during which the OPA charges remained pending, the plaintiff was also the target of criminal proceedings in Cheatham County. She

---

[2] Hammond-Beville alleges that the MNPD Defendants used the OPA proceeding to retaliate against her after she complained about OPA's alleged practice of favoring white male officers accused of misconduct vis-à-vis their non-white-male counterparts.

was indicted by a Cheatham County Grand Jury in January 2019 for misdemeanor child abuse, based on false and material misrepresentations by Landis. In March 2019, however, the Cheatham County Sheriff received a letter from Cheatham County District Attorney Ray Crouch, notifying him that Landis'[s] testimony had been "impeached so many times that the D.A.'s Office would no longer rely on Landis'[s] credibility, and would no longer be calling him as a witness in court." The Sheriff, at that point, instituted a review of Landis'[s] work, which ultimately led to Landis'[s] resignation from the Sheriff's Department and the dismissal of all still-pending criminal cases initiated by Landis. The Cheatham County Circuit Court dismissed the indictment against the plaintiff in November 2019.

Although MNPD officials were notified of the dismissal of the charges against the plaintiff and of Landis'[s] resignation, the disciplinary charges remained pending against her for another ten months, while MNPD officials kept the plaintiff on decommissioned status and continued to pressure her to accept a demotion. As indicated above, the charges were not dismissed until September 2020, at which time the plaintiff was returned to active duty.

Appellant's Br. at 5–7 (quoting Mem. at 4–7, R. 37).

Hammond-Beville then filed her current lawsuit against defendants in November 2020, asserting a claim against Landis under 42 U.S.C. § 1983 (giving the district court federal-question jurisdiction) and a claim against the MNPD Defendants for malicious prosecution under Tennessee state law (over which the district court exercised supplemental jurisdiction). Shortly after, the MNPD Defendants moved to dismiss for failure to state a claim or, alternatively, on state-law qualified-immunity grounds. *See, e.g.*, *Youngblood v. Clepper*, 856 S.W.2d 405, 407–08 (Tenn. Ct. App. 1993). They contended that an OPA investigation is not a judicial or quasi-judicial proceeding for purposes of a Tennessee malicious-prosecution claim or that, even if it is, that point was not clearly established at the time of their conduct. Hammond-Beville filed an amended, operative complaint in January 2021, and the MNPD Defendants renewed their motion to dismiss for failure to state a claim or on qualified-immunity grounds. The district court eventually denied the MNPD Defendants' motion in April 2021, after which they took the present appeal.

**II.**

Ordinarily we would have jurisdiction to review the denial of qualified immunity on an interlocutory basis under a combination of 28 U.S.C. § 1291 and the collateral-order doctrine. Denials of qualified immunity are not strictly final, because they do not produce a final judgment, but we treat them as "final" under the collateral-order doctrine because they are "effectively unreviewable" upon appeal from a final judgment. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)). That is because qualified immunity provides, at the very least, an immunity from trial, and there is no way to "undo" a trial that an officer wrongly had to undergo. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see also King v. Betts*, 354 S.W.3d 691, 704 (Tenn. 2011).

This appeal has a slight twist. It does not involve the usual federal-common-law qualified-immunity defense to a § 1983 action alleging constitutional violations. Instead, it involves the rejection of a state-law qualified-immunity defense to a state-law tort. We can treat the denial of a state-law qualified-immunity defense as immediately appealable under the collateral-order doctrine if the relevant state courts would likewise permit an immediate appeal within the state system upon the denial of a state-law immunity. *See Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407–08 (6th Cir. 2007).

Though the caselaw is sparse,[3] Tennessee appellate courts apparently do permit interlocutory appeals after the denial of state-law immunities. *See, e.g.*, *Boling v. City of Pigeon*

---

[3] The cases the MNPD Defendants cite suggesting that an interlocutory appeal is permissible are not on point, since they deal with Tennessee courts entertaining immediate appeals of denials of qualified immunity in § 1983 actions; qualified immunity there being a federal-common-law defense rather than a state-law defense. *See Fann v. Bailey*, 841 S.W.2d 833, 835 (Tenn. Ct. App. 1992) (permitting an immediate appeal, pursuant to U.S. Supreme Court precedent, of a qualified-immunity denial in a § 1983 action); *Cantrell*, 78 S.W.3d at 904 n.3, 906 (same). Yet under *Livermore*, the relevant question is whether the state courts would permit immediate appeal after

*Forge*, No. E2007-01652-COA-R10-CV, 2008 WL 4366119, *1–2 (Tenn. Ct. App. Sept. 22, 2008) (permitting interlocutory appeal after denial of qualified immunity under Tenn. Code Ann. § 55-5-204(d)); *Smith v. Pratt*, No. M2008-01540-COA-R9-CV, 2009 WL 1086953, *1 (Tenn. Ct. App. Apr. 22, 2009) (permitting interlocutory appeal after denial of qualified immunity under Tenn. Code Ann. § 63-6-219(d)); *Friedli v. Kerr*, No. M1999-02810-COA-R9-CV, 2001 WL 177184, *1 (Tenn. Ct. App. Feb. 23, 2001) (permitting interlocutory appeal after denial of qualified immunity under Tenn. Code Ann. §§ 44-20-101–105). Thus, because Tennessee courts would treat the present denial of qualified immunity as a collateral order properly subject to an interlocutory appeal, we may do the same.

## III.

We review the decision to deny qualified immunity *de novo. Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 677 (6th Cir. 2001); *accord Cantrell v. DeKalb County*, 78 S.W.3d 902, 906 (Tenn. Ct. App. 2001). Because this appeal comes to us at the motion-to-dismiss stage, we accept "the facts alleged in the complaint as true" and draw "all reasonable inferences therefrom in the plaintiff's favor." *Hardy*, 260 F.3d at 677.

## IV.

Having established our jurisdiction and the standard of review, we turn now to the merits of the MNPD Defendants' motions to dismiss for failure to state a claim and for qualified immunity. For the reasons below, we conclude that the district court properly denied the MNPD Defendants' motions.

---

the denial of a *state-law* immunity. 476 F.3d at 407 ("[W]e must look to state immunity law to determine whether a denial of immunity based on *state law* is appealable.") (emphasis added).

### 1. Tennessee Malicious Prosecution and the Qualified-Immunity Defense

The tort of malicious prosecution under Tennessee law contains three elements: "(1) a prior suit or judicial proceeding was instituted without probable cause, (2) [the] defendant brought such prior action with malice, and (3) the prior action was finally terminated in [the] plaintiff's favor." *Roberts v. Fed. Exp. Corp.*, 842 S.W.2d 246, 247–48 (Tenn. 1992). For purposes of this appeal, the MNPD Defendants dispute only the first half of element (1)—whether the OPA investigation was "a prior suit or judicial proceeding" for purposes of malicious prosecution. Their argument is twofold. They first assert that the OPA investigation was not a "judicial proceeding" as that term has been defined in the caselaw. But they also claim that even if we determine that the OPA investigation, on the facts alleged, constituted a "judicial proceeding," that point was not "clearly established" at the time of defendants' behavior. Thus, they argue, they are still entitled qualified immunity and a reversal of the district court.

Defendants are at least correct that Tennessee recognizes a state-law qualified-immunity defense to state tort actions against government officers for their discretionary functions. *See Youngblood*, 856 S.W.2d at 405. As the Tennessee Supreme Court has explained, this defense is highly analogous to the qualified-immunity defense the U.S. Supreme Court has recognized for state officers sued under 42 U.S.C. § 1983. *Id.* at 406–07. Of course, the relevant question in a § 1983 suit is whether the defendant violated clearly established *federal* law, while here we must decide whether defendants committed a clearly established state tort violation. Otherwise, the federal and state qualified-immunity analyses are "the same." *Willis v. Neal*, No. 1:04-CV-305, 2006 WL 1129388, *2 (E.D. Tenn. Apr. 24, 2006); *see also Cawood v. Booth*, No. E2007-02537-COA-R3-CV, 2008 WL 4998408, *11–12 (Tenn. Ct. App. Nov. 25, 2008) (noting Tennessee's application of qualified immunity to state-law torts when the alleged violation was not "clearly

established"); *Rogers v. Gooding*, 84 F. App'x 473, 477 (6th Cir. 2003) (affirming the district court's grant of qualified immunity on Tennessee assault and battery claims). Thus, if extant precedent would have put any reasonable officer on notice during the events in question that an allegedly baseless MNPD OPA investigation could constitute malicious prosecution, we must affirm the district court's denial of the MNPD Defendants' qualified-immunity request. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).

>2. *The Tennessee Supreme Court Established Long Ago that a Baseless Internal-Affairs Investigation within the MNPD Could Constitute Malicious Prosecution*

The OPA investigation, to be sure, was not a "judicial proceeding" in a strict sense of the term; it was neither a civil lawsuit nor a criminal prosecution. *Cf. Kauffman v. A.H. Robins Co.*, 448 S.W.2d 400, 403 (Tenn. 1969). But the MNPD Defendants have not appealed the district court's order on the ground that administrative proceedings cannot support malicious prosecution; if that were their argument they would lose. Back in 1969, the Tennessee Supreme Court confronted in *Kauffman v. A.H. Robins, Co.* whether the prior "judicial proceeding" alleged to be the forum for a malicious prosecution must be, literally, a civil or criminal proceeding. *Id.* That argument might have had some force as a matter of the tort's early history, since it "originally arose from criminal proceedings." *Id.* at 402. But the Tennessee Supreme Court rejected the idea that malicious prosecution could thus arise *only* from classic "judicial proceedings." In more recent times, it noted, greater and greater responsibility to adjudicate individuals' legal rights had been granted to administrative agencies. *Id.* at 403. (*Kauffman* itself concerned false allegations against a pharmacist made before Tennessee's state board of pharmacy. *Id.* at 401.) As a result, the court noted, "[t]he same harmful consequences may result from malicious prosecution in this type of proceeding as from strictly judicial proceedings." *Id.* at 404. The court therefore expressed its

"view that the 'prior judicial proceeding' need not be conducted in a 'court' in the strict technical and legal sense." *Id.* at 403. Rather, insofar as administrative proceedings could "injur[e] . . . the legally protected rights of another," such "proceedings are at least 'quasi-judicial' to the extent that they may be the basis for a malicious prosecution action." *Id.* at 404, 403.

So *Kauffman* establishes the general point that Tennessee malicious-prosecution claims do not require a prior "judicial proceeding" "in the strict technical and legal sense." *Id.* at 403. It is instead sufficient to have been subjected to some administrative proceeding capable of adversely affecting the plaintiff's "legally protected interests." *Id.* at 403. Those points are helpful to Hammond-Beville, no doubt, but they are insufficient on their own to defeat the MNPD Defendants' assertion of qualified immunity. *See, e.g.*, *Cawood*, 2008 WL 4998408, at *11 ("The right allegedly violated cannot be asserted at a high level of generality[.]") (quoting *Rogers*, 84 F.App'x at 475). What Hammond-Beville really needs is precedent applying *Kauffman* in the specific context of an internal-affairs proceeding within a police department and holding that such an internal-affairs proceeding can likewise constitute malicious prosecution.

But, it turns out, the Tennessee Supreme Court decided a case in 1985 called *Lewis v. Allen* that applied *Kauffman* to Hammond-Beville's *own department*—the MNPD—to hold that a baseless internal-affairs investigation can likewise constitute a "quasi-judicial proceeding" for purposes of a malicious-prosecution action. *Lewis*, 698 S.W.2d at 59–60. There, a motorist accused several officers of having stolen cash during a traffic stop. *Id.* at 59. The allegations triggered an investigation by the OPA's predecessor unit within the MNPD, the Internal Security Section ("ISS"). *Id.* The ISS eventually determined that the theft claim was baseless, and the exonerated officers sued the motorist for malicious prosecution. *Id.* The motorist moved to dismiss, arguing that the ISS proceeding was neither judicial nor quasi-judicial. *Id.* at 58–59. Taking the plaintiffs'

allegations as true, however, the Tennessee Supreme Court held that they were sufficient to show at least at the motion-to-dismiss stage that the ISS investigation had been a quasi-judicial proceeding. *Id.* at 60.

The court reached that conclusion in two steps. It first clarified its understanding of *Kauffman*, explaining that it interpreted the case

> as holding that any administrative tribunal or body duly established to conduct investigations or investigatory hearings and to make adjudicatory findings that may adversely affect legally protected interests of persons subjected to its jurisdiction will satisfy the first element of a malicious prosecution claim.

*Id.* It then explained why, in its view, the Internal Security Section satisfied the *Kauffman* test:

> Plaintiffs have alleged in essence that the Internal Security Section received defendant's charges, called them before it to respond, took other investigatory action, and ultimately made an adjudication exonerating them. They allege that those actions were quasi-judicial administrative proceedings. We find those allegations sufficient on the questioned element of an action for malicious prosecution[.]

*Id.* The court thus held that the plaintiffs had stated a claim for malicious prosecution, reversed the lower court's dismissal of their complaint, and remanded the case for trial. *Id.*

*Lewis v. Allen* clearly establishes that a police internal-affairs investigatory body, within the MNPD no less, can constitute a "quasi-judicial proceeding" for purposes of a subsequent malicious-prosecution action. The same body within the MNPD has, of course, undergone a name-change in the intervening years—from the "Internal Security Section" to the "Office of Professional Accountability." But the operative features have remained the same. Note the four factors that *Lewis* highlighted: the body's ability to (1) receive charges against an officer, (2) call the officer before it to determine the officer's response, (3) take investigatory action based on such charges, and (4) make "adjudicatory findings" "that may adversely affect legally protected interests of persons subject to its jurisdiction." *Id.* As Hammond-Beville has plausibly alleged

(and, indeed, as defendants have stipulated on appeal), the modern-day OPA likewise possesses all of those features.

*First*, the OPA received charges against Hammond-Beville. Defendant Morante, acting as the OPA's Director, received the child-abuse allegations against Hammond-Beville in June 2018. Morante then issued a "Notice of Complaint" informing Hammond-Beville that the OPA was launching its own child-abuse investigation based on the reports from Cheatham County.

*Second*, the OPA called Hammond-Beville to respond. Morante's "Notice of Complaint" advised Hammond-Beville that she was being investigated for child abuse "and directed the plaintiff to immediately contact Carter to acknowledge receipt of the Notice and 'voice her interest in the matter.'" The Notice also requested that Hammond-Beville give "a 'complete and unwavering truthful admission,'" supposedly so that she could "avoid[ ] an investigation," and it also requested that she participate in MNPD's "Pre-Investigation Settlement Process." Last, Hammond-Beville had to attend a "Presentation Meeting" at which defendant Sharpe read the charges against her and she had to enter her corresponding "plea."

*Third*, the OPA took investigatory action based on the charges. Defendant Carter completed an "investigation report and submitted it to defendants Sharpe and Morante in August 2018." "Carter's report alleged that the plaintiff had abused her stepdaughter and lied by denying the abuse," thus crediting Landis's false allegations over "the conclusions reached by" both child services and the juvenile-court guardian *ad litem*.

*Fourth*, the OPA both actually made adjudicatory findings contrary to Hammond-Beville's legal interest and could have made further adverse findings had defendants' child-abuse allegations not fallen apart. That is, Sharpe and Morante had to adjudicate the veracity of Carter's

August 2018 investigative report to reach a formal charging decision.[4] Sharpe and Morante "signed off" on Carter's report—lending the allegations their imprimatur—and formulated charging decisions against Hammond-Beville. As a result, she was formally charged with both a violation of the law and dishonesty during the investigation; supposed offenses for which Sharpe and Morante recommended dismissal. *Id.* These decisions adversely affected Hammond-Beville's legally protected interests, as they plausibly contributed to her having to remain on "decommissioned" status until September 2020.[5] Likewise, had defendants' allegations not fallen through, Hammond-Beville would have faced further disciplinary hearings to determine whether she would, indeed, be terminated.

*Lewis*, therefore, clearly established well before 2018 that defendants' behavior could constitute malicious prosecution. Said differently, any reasonable officer would have understood after *Lewis* that bringing baseless allegations against another officer in an internal-affairs proceeding could have supported a subsequent malicious-prosecution action. *See King*, 354 S.W.3d at 705 (discussing "whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful."). Thus, the district court properly denied the MNPD Defendants' motion to dismiss.

---

[4] Hammond-Beville alleges that though Carter lacked a formal charging role under the OPA structure, he still exercised *de facto* influence over Sharpe and Morante's formal charging decision.

[5] Strictly speaking, Hammond-Beville was already on decommissioned status by February 2, 2018, before the OPA investigation began. But drawing all reasonable inferences in Hammond-Beville's favor, as we must at the motion-to-dismiss stage, we can reasonably infer that the OPA's subsequent ratification of Landis's claims contributed to the duration of Hammond-Beville's decommissioning period. In other words, had the OPA investigation properly determined the allegations false, it is reasonable to conclude that Hammond-Beville could have returned to active duty sooner. Accordingly, the OPA's charging decision adversely affected Hammond-Beville's legally protected interest in returning to active duty.

The MNPD Defendants' counterarguments are unpersuasive. Perhaps realizing that *Lewis* disposes of their case, the MNPD Defendants have devoted significant energy to explaining why it should not actually govern. Their basic contention is that the ISS investigation at issue in *Lewis* was not *in fact* a quasi-judicial proceeding, and so *Lewis* could not have clearly established that an internal-affairs proceeding could constitute malicious prosecution. Recall that *Lewis* was decided at the motion-to-dismiss stage, and thus that the Tennessee Supreme Court took the officers' allegations about the ISS's powers as true. *See Lewis*, 698 S.W.2d at 59–60. When it *assumed* the ISS had the four responsibilities noted above, the Tennessee Supreme Court held that those powers—*taken as true* that the ISS possessed them—amounted to a quasi-judicial proceeding for malicious-prosecution purposes. *Id.* at 60. But, say the MNPD Defendants, it was revealed in *Lewis*'s subsequent history after remand to the trial court that the ISS in fact did *not* possess those four powers. At least that is the lesson the MNPD Defendants would have us draw from the trial court's unreasoned summary-judgment order[6] entered on remand in response to Allen's counsel's motion for summary judgment, which had argued the ISS in fact lacked such powers.

The MNPD Defendants' argument has multiple problems. The first is that *Lewis*—just as this case—arose at the motion-to-dismiss stage. *See id.* at 59. So the question in *Lewis* was not what features the ISS *in fact* had, but what features the plaintiffs had *alleged it* to have. *Id.* at 60. If those allegations, taken as true, would amount to a quasi-judicial proceeding, then those allegations sufficed to *state a claim* for malicious prosecution. *Id.* The allegations by themselves obviously could not *win* the case but, taken as true, were at least sufficient to survive a motion to

---

[6] That 1989 trial-court order states, in its entirety, "After a careful review of the entire record in this cause, the Court concludes that the original Defendant, Thomas C. Allen, Jr's. [sic] Motion for Summary Judgment is well taken and therefore, is respectfully granted. The original Plaintiffs will pay the costs. Enter an order accordingly. The clerk will serve a copy hereof on counsel." *See* Mem., R. 21-2.

dismiss. *Id.* Whether those allegations turned out to be true or not at a later stage does not affect whether, on a motion to dismiss, they stated a claim.

Because this case likewise arises on a motion to dismiss, we undertake the same inquiry as did *Lewis*—not some other inquiry the trial court undertook on remand at a different stage of the proceeding. We do not now ask what powers the OPA *in fact* possesses; we instead review what powers Hammond-Beville has *alleged* the OPA to possess. *See Hardy*, 260 F.3d at 677. We then take those alleged powers as true, *id.*, and compare them with the four alleged powers of the ISS found sufficient in *Lewis* to state a claim to see whether the OPA's alleged powers meet or exceed the ISS's alleged powers. And because they do, Hammond-Beville has at least stated a claim for malicious prosecution. She may still lose if it turns out that she cannot muster evidence for her allegations at later stages of the suit, after her allegations have lost the presumption of truth. *See, e.g.*, *Leonard v. Robinson*, 477 F.3d 347, 353–54 (6th Cir. 2007). But whether the ISS lacked some power *in fact*, or whether the OPA may eventually be shown to lack some power *in fact*, does not mean that Hammond-Beville has failed to state a claim.

Moreover, under no principle of qualified-immunity jurisprudence of which we are aware may a litigant use an unreasoned trial-court order to essentially "de-establish" a legal proposition otherwise clearly established by a published state supreme court decision. And on further inspection, defendants' argument is even more tenuous than that. They do not rely on the trial-court order itself, which contains no reasoning. They instead rely on the arguments from a summary-judgment *brief* supposedly incorporated by reference into the trial-court order. But that brief itself does not even accurately apply *Lewis*. The brief claims that the ISS was not quasi-judicial because it had (1) no power to impose penalties on the officers, (2) no power to affect legally protected interests, (3) no power to hold hearings, and (4) no power to issue subpoenas or

administer oaths to witnesses. Yet *Lewis* itself never made (1), (3), or (4) prerequisites for a quasi-judicial proceeding. *See generally Lewis*, 698 S.W.2d at 60. It never purports to require that the body impose "penalties"—only that it "may adversely affect legally protected interests of persons subject to its jurisdiction." *Id.* It also never requires that the body "hold hearings"—only that it "conduct investigations *or* investigatory hearings and [ ] make adjudicatory findings." *Id.* (emphasis added). Likewise, nowhere does the *Lewis* opinion mention oaths or subpoenas. *See id.* So the trial court's opinion is unreasoned, and the brief on which it is based is itself a patent distortion of the *Lewis* requirements. There is no logical reason that either should displace the holding of *Lewis* itself.

The MNPD Defendants also argue that the OPA investigation was not a quasi-judicial proceeding because it never resulted in a "formal disciplinary hearing." This argument has a certain irony to it, since the reasons that Hammond-Beville never received her formal hearing were that (1) defendants would not give it to her, and (2) defendants' false allegations collapsed before a hearing could take place. In any event, defendants once again seek to graft onto *Lewis* a requirement that it does not contain. *Lewis* explains that the body must be "duly established to conduct investigations or investigatory hearings and [ ] make adjudicatory findings that may adversely affect legally protected interests of persons subject to its jurisdiction." *Id.* at 60. The OPA satisfies those requirements. It both conducted an investigation—Carter's report, which Sharpe and Morante endorsed—and it then made an adjudicatory finding that Hammond-Beville had likely committed the abuse, violated two portions of the MNPD code of conduct, lied by denying the abuse, and deserved the sanction of dismissal.

The MNPD Defendants retort that it ultimately would have been some official *outside* the OPA itself to actually impose the penalty of dismissal, rather than the OPA, and thus that the OPA

must not be quasi-judicial. But again, *Lewis* never says that the body must have the power to impose formal penalties. It just says that it must have the power to "make adjudicatory findings that may adversely affect legally protected interests of persons subject to its jurisdiction." *Id.* The plaintiff officers satisfied that requirement in *Lewis* itself by alleging that the ISS had determined the defendant-mororist's accusations false—what *Lewis* called "an adjudication exonerating" the officers. *Id.* at 59–60. The OPA did the same here, just in reverse—it made an adjudication inculpating Hammond-Beville. That satisfies *Lewis*'s "adversely affect legally protected interests" test, whether or not the OPA itself had the power to formally execute the penalty it recommended.

Nor are we convinced, given *Lewis*, that the district court erred in light of the four other cases defendants broach: *Spain v. Connolly*, 606 S.W.2d 540 (Tenn. 1980); *Wells v. Hefner*, No. M.2004-02313-COA-R3-CV, 2006 WL 1184216, *1 (Tenn. Ct. App. May 3, 2006); *Blizzard v. Aquinas College*, No: 3:11-2016, 2011 WL 3291812, *1 (M.D. Tenn. Aug. 1, 2011); and *Pagliara v. Moses*, 605 S.W.3d 619 (Tenn. Ct. App. 2020). None presents a compelling rationale against applying *Lewis* to deny qualified immunity. Those cases were resolved before *Lewis* (*Spain*), did not deal with a formally begun internal-affairs investigation or a malicious-prosecution claim (*Spain*), or involved other kinds of investigations, like university disciplinary hearings and a criminal investigation (*Wells*, *Blizzard*, and *Pagliara*).

Last, the MNPD Defendants argue that the district court "impermissibly imposed the burden" on them to show their entitlement to qualified immunity, rather than imposing the burden on Hammond-Beville to illustrate their *lack* of qualified immunity once they had invoked the defense. We are satisfied that both here and below, Hammond-Beville discharged her burden to identify the relevant precedent (*Lewis*) establishing that defendants violated her clearly established

rights. *See, e.g.*, *Warda v. C.I.R.*, 15 F.3d 533, 539 n.6 (6th Cir. 1994) (explaining that we "may affirm on any ground supported by the record").

**V.**

By the time of the MNPD Defendants' alleged misconduct, it had been clearly established for over thirty years that a baseless internal-affairs proceeding within the MNPD could constitute malicious prosecution. The district court properly denied the MNPD Defendants' motions to dismiss for failure to state a claim and on qualified-immunity grounds. Thus, we AFFIRM.